# THE STATE v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

## In Banc, May 7, 1912.

1. **CONSTITUTIONAL LAW: Semi-monthly Payment: Beneficial.** A statute which requires railroad companies to pay their employees as often as twice a month is a beneficial law to such employees. The courts will take judicial notice of that fact.

2. ———: ———: **Harassing and Vexatious Law: No Issue.** An allegation that a statute requiring corporations to make semi-monthly payments to wage-earners "was enacted to harass and annoy the railroads of the State" does not raise any issue of which the court can take notice.

3. ———: ———: **Wisdom of Law.** Whether a law is wise or unwise is a matter over which the courts have no control. They concern themselves only with the legality or constitutionality of an act.

4. ———: ———: **Police Power: Variable.** The police power in its very nature must be somewhat elastic to meet the changing and shifting conditions brought about by the increase of population and the complex, commercial and social relations of the people.

5. ———: ———: **Is Referable to Police Power.** The enactment of the statute requiring corporations to pay their wage-earners twice a month, can be upheld only as an exercise of the police power, is of general benefit to the laborer, and is valid if it does not violate some provision of the State or Federal Constitution.

6. ———: ———: **Police Power: In Disregard of Constitutional Rights.** The exercise of the police power cannot be made a cloak under which to overthrow or disregard constitutional rights.

7. ———: ———: ———: **Freedom of Contract: Unequal Situation: Penalty.** It is not an unreasonable abridgment of the freedom and right to contract to compel railroad companies to pay their wage-earners semi-monthly; and if the General Assembly can, on account of the unequal situation of laborers and their corporate employers, fix the time for paying wages, it may with equal propriety prescribe fines and penalties to compel the payment of such wages. Such a statute is not in conflict with section 4 of article 2 of the Constitution, declaring that "all persons have a natural right to life,

liberty and the enjoyment of the gains of their own industry;" nor with section 30 of article 2, declaring that "no person shall be deprived of life, liberty or property without due process of law;" nor with section 1 of the Fourteenth Amendment prohibiting any State from denying to its citizens equal protection of the laws.

> *Held,* by GRAVES, J., concurring, with whom LAMM and FERRISS, JJ., concur, that the right to contract is one which belongs to every person, whether employer or employee, rich or poor, natural or artificial, and when a law abridges the freedom of the employer to contract it necessarily likewise abridges the employee's freedom also; and a law which curtails that freedom can be upheld only as a reasonable exercise of the police power, which looks specially to the health, safety, morals and general welfare of the citizen; and while this semi-monthly payment statute goes to the very verge of the police power, yet, in view of the holding in the case of State ex rel. v. Vandiver, 222 Mo. 206, and the trend of recent adjudications, both in this and other jurisdictions, upholding legislation designed to protect laborers, it is not such an unreasonable exercise of the police power as to invalidate the statute.

8. ———: ———: ———: **Denial of Justice.** Nor is such statute in conflict with section 10 of article 2 of the Constitution, declaring that right and justice shall be administered without sale, denial or delay, although it may deny to a defendant the right to plead in a court of justice as a defense a contract with an employee providing for a monthly or other payment.

9. ———: ———: ———: **Private Property for Private Use.** Nor is such statute an attempt to take private property for a private use, nor does it authorize the taking of private property under the guise of its being for a public use, without compensation. There is no similarity between the condemnation of property and the compelling of a person to pay a debt to one who has already earned the same by his labor.

10. ———: ———: ———: **Impairment of Contracts.** The statute requiring railroad companies to pay their employees twice a month does not impair the obligations of contracts, where there were at the time of its enactment no existing contracts providing for different payments. The statute applies only prospectively.

11. ———: ———: ———: **Irrevocable Privileges.** Neither did said statute grant to such employees irrevocable privileges denied to other employees similarly situated. The statute is subject to repeal.

State v. Railroad.

12. ———: ———: **Title: Broader Than Act.** A title which is broader than the statute enacted thereunder could not have misled any one. Although the Semi-monthly Payment Act in its body includes only mechanics, laborers and other servants, it is not invalid because its title includes all employees of all corporations.

13. ———: ———: **Class Legislation: Applicable to Corporations Only.** An act requiring all corporations to pay their employees semi-monthly, but does not require private individuals or partnerships who employ laborers in the same fields of industry to make semi-monthly payments, is not such class legislation as violates the Constitution prohibiting special or class legislation. There are potent reasons for the discrimination against corporations—among others that laborers cannot know stockholders of corporations as they can partners or individual employers, nor their solvency, nor their liabilities, nor can they look to any property for the payment of their wages except the corporation's property, but all the property of the partner or the individual is liable for the laborer's wages.

    *Held*, by GRAVES, J., concurring, with whom LAMM and FERRISS, JJ., concur, that the placing of corporations in a class to themselves is not an unreasonable classification.

14. ———: ———: **Interstate Commerce.** Where there is no showing that any of the States into which defendant's railroads run have not a law requiring semi-monthly payment of employees, or any similar law, and there is no law of Congress on the subject, and there is no showing that any considerable number of defendant's employees have quit work because of semi-monthly payments, it is not easy to conceive how the enforcement of the law will interfere with the efficient management of defendant's interstate business.

15. ———: ———: **Indirect Amendment of Charter: Alteration of Corporate Rights: Police Power.** Neither corporations nor citizens have any vested rights in statutes. When the general welfare demands a new law, to operate prospectively, that can be upheld under the police power, a corporation has no chartered or implied rights that inhibits such an enactment, even though its enforcement may result in incidental injury to the corporation. The Missouri Pacific Railway Company, chartered prior to the adoption of the Constitution of 1875, has no such vested charter rights as make void as to it a statute requiring the semi-monthly payment of its employees, since said statute is an appropriate and necessary police regulation, whose enforcement will not prevent said company from remuneratively operating its railroad as a common carrier,

or otherwise prove injurious to it or other corporations, but will encourage honest toil and enable wage-earners the more readily to supply themselves with the necessaries of life.

Appeal from Vernon Circuit Court.—*Hon. B. G. Thurman,* Judge.

AFFIRMED.

*Robert T. Railey* for appellant.

(1)   Said Act of 1911 is in conflict with section 1 of article 14 of the amendments to the Constitution of the United States, in this: That it denies to defendant the equal protection of the laws, and attempts to deprive it of its property without due process of law. The above act discriminates in favor of individuals, tenants in common and copartnerships, similarly situated and engaged in the same business as corporations, by permitting the former to contract for labor and to pay for same at any date agreed upon, while corporations, engaged in identically the same business, employing the same number and class of workmen, are compelled to pay them semi-monthly. Tiedeman's Lim. of Police Powers, sec. 178, p. 572; Cooley's Const. Lim. (6 Ed.), pp. 484, 709; State v. Loomis, 115 Mo. 307; State v. Julow, 129 Mo. 163; State v. Tie Co., 181 Mo. 536; State v. Miksicek, 225 Mo. 561; Ex parte House, 227 Mo. 635; Godcharles v. Wigeman, 113 Pa. St. 431; People v. Coler, 116 N. Y. 1; Wright v. Hart, 182 N. Y. 334; Ives v. Railroad, 94 N. E. (N. Y.) 431; Wynehamer v. People, 13 N. Y. 378; People ex rel. v. Otis, 90 N. Y. 48; In re-Jacobs, 98 N. Y. 98; People v. Gillson, 109 N. Y. 389; People v. Orange Co., 67 N. E. (N. Y.) 129; People v. Zimmerman, 92 N. Y. Supp. 497; Comm. v. Perry, 155 Mass. 117; Johnson v. Mining Co., 127 Cal. 555; Ex parte Kubach, 85 Cal. 274; Ex parte Whitwell, 19 L. R. A. (Cal.) 727; Millett v. People, 117 Ill. 294; Braceville v.

People, 147 Ill. 66; Coal Co. v. Harrier, 207 Ill. 624; Frerer v. People, 141 Ill. 171; Richie v. People, 155 Ill. 98; Harding v. People, 160 Ill. 459; Bessette v. People, 193 Ill. 334; Iron Co. v. State, 160 Ind. 379; Shaver v. Pa. Co., 71 Fed. 931; State v. Robins, 71 Oh. St. 273; Jones v. Hotel Co., 79 Fed. 477; State v. Haun, 61 Kan. 146; Brick Co. v. Perry, 69 Kan. 297; Low v. Printing Co., 41 Neb. 127; State v. Goodwill, 33 W. Va. 179; State v. Coal Co., 33 W. Va. 188; Block v. Schwartz. 27 Utah, 387; State ex rel. v. Kreutzberg, 58 L. R. A. (Wis.) 748; Adair v. United States, 208 U. S. 161; Muller v. Oregon, 208 U. S. 412; Lochner v. New York, 198 U. S. 45. (2) The word "corporation" mentioned in the Acts of 1911 of Missouri, page 150, must be treated as though it meant the names of all the individuals who are members of said corporations. It has long been settled that the word "person" within the meaning of the Fourteenth Amendment to the Constitution of the United States applies to a corporation. Beach on Monopolies and Industrial Trusts, sec. 230; Providence Bank v. Billings, 4 Pet. (U. S.) 514; Railroad v. Railroad, 112 U. S. 414; Railroad v. Ellis, 165 U. S. 154; Johnson v. Mining Co., 59 Pac. (Cal.) 304. (3) The Act of 1911, page 150, cannot be construed as an amendment of all the charters of all the corporations, which employ mechanics, laborers or other servants. Nor can it, under the Constitution and laws of Missouri, be considered as an amendment of the charter of any corporation, whether organized under the laws of this State or elsewhere. Secs. 2 and 5, art. 12, Constitution; sec. 34, art. 4, Constitution; sec. 53 and pars. 24, 25 and 26, Constitution; secs. 2975, 2977, 2993, 3048, 3049, 2360, 3051, 3052, R. S. 1909; Sloan v. Railroad, 61 Mo. 31; State v. Loomis, 115 Mo. 307; State v. Julow, 129 Mo. 163; State v. Tie Co., 181 Mo. 536; Ex parte House, 227 Mo. 635; Leach v. Tie Co., 111 Mo. App. 650; Cooley's Const. Lim. (6 Ed.), 709, 710; Tiede-

man's Lim. of Police Powers, sec. 191, p. 584; Taylor
on Private Corporations (5 Ed.), secs. 450, p. 430;
2 Cook on Corporations (4 Ed.), secs. 492 to 496;
Railroad Tax Cases, 13 Fed. 754-5, 116 U. S. 138;
State v. Haun, 61 Kan. 146; Braceville v. People, 147
Ill. 66; Railroad v. Ellis, 165 U. S. 150; Johnson v.
Mining Co., 59 Pac. (Cal.), 304; Freeman's Criticism,
62 Am. St. Rep. 181; Railroad v. Smith, 173 U. S. 698;
Adair v. United States, 208 U. S. 173; V. B. & T. Co. v.
Perry, 69 Kan. 297; Gillespie v. People, 188 Ill. 176;
State ex rel. v. Kreutzberg, 90 N. W. (Wis.) 1098;
People v. Marcus, 185 N. Y. 257; Low v. Printing Co.,
41 Neb. 127.   (4)   The Legislature cannot even pass
a law which will prohibit a railway company from
compelling an adult to quit its service or to withdraw
from a labor union, nor on the other hand can the
Legislature pass an act which will prohibit an em-
ployee from refusing to work for any corporation, if
any adults are employed in behalf of same who are
not members of a labor union.   In other words, the
right of personal contract is so sacred that the Legis-
lature cannot interfere with same except in cases
where the health, safety or welfare of the public are
involved.   State v. Julow, 129 Mo. 163, 175; Clothing
Co. v. Watson, 168 Mo. 133; Adair v. United States,
208 U. S. 173; V. B. & T. Co. v. Perry, 76 Pac. (Kan.)
1848; Gillespie v. People, 188 Ill. 176; State ex rel.
Zillmer v. Kreutzberg, 114 Wis. 530; People v. Mar-
cus, 185 N. Y. 257. (5) No statutory enactment which
interferes with the right of private contract can be
upheld in those States where the Legislature is not
authorized to amend the charters of corporations.
Under this head, no legislative enactment can with-
stand the test of judicial criticism or be sustained
as constitutional, which deprives a corporation or in-
dividual of the right to hire men who are *sui juris* by
the month, and to pay them accordingly, or less fre-
quently if agreed upon.   Godcharles v. Wigeman, 113

Pa. St. 431; Iron Co. v. State, 160 Ind. 379; Braceville
v. People, 147 Ill. 66; Railroad v. Long, 82 N. E.
(Ind.) 757; Johnson v. Mining Co., 127 Cal. 555;
State v. Haun, 61 Kan. 146. The following cases re-
lating to the same subject and practically announcing
the same principles held the acts under consideration
unconstitutional. State v. Loomis, 115 Mo. 307; State
v. Tie Co., 181 Mo. 536; Froer v. People. 141 Ill. 171;
Commonwealth v. Perry, 155 Mass. 117; Low v. Print-
ing Co., 41 Neb. 127; Railroad v. Wilson, 19 S. W.
(Tex.) 911; Leach v. Tie Co., 111 Mo. App. 650; Peo-
ple v. Coler, 166 N. Y. 1; People v. Zimmerman, 92
N. Y. Supp. 497; Ives v. Railroad, 94 N. E. (N. Y.)
431; Millett v. People, 117 Ill. 294; State v. Goodwill,
33 W. Va. 179; State v. Coal Co., 33 W. Va. 188; Street
v. Varney, 160 Ind. 338; Coal Co. v. Harrier, 207 Ill.
624; In re Eight-Hour Law, 21 Colo. 29; Wright v.
Hart, 182 N. Y. 334; Ballard v. Oil Co., 34 So. (Miss.)
533; Shaver v. Pa. Co., 71 Fed. 931; Jordan v. State,
103 S. W. (Tex.) 633; State v. Goebroski, 56 L. R. A.
570; Block v. Schwartz, 76 Pac. 22; Tiedeman's Lim.
of Police Powers, sec. 178, p. 572; Cooley's Const.
Lim. (6 Ed.), 709 and 710. (6) Said act violates sec-
tion 28, article 4, Constitution, in that, in its title it
includes all employees of all corporations doing busi-
ness in the State of Missouri, while the body of the
act is misleading, indefinite and uncertain, and only
extends the special privileges to mechanics, laborers
and other servants. State v. Burgdoerfer, 107 Mo.
29; State v. Coffee Co., 171 Mo. 643; State v. Fulks,
207 Mo. 26; St. Louis v. Wortman, 213 Mo. 13; State
v. Rawlings, 232 Mo. 557; State ex rel. v. Gordon, 233
Mo. 387; Cooley's Const. Lims. (7 Ed.), p. 205; Wil-
liams v. Railroad, 233 Mo. 667. (7) The act under con-
sideration is in conflict with section 8, article 1, Consti-
tution of the United States and the various laws
passed by Congress thereunder, in this: That de-
fendants are engaged in interstate commerce, and own

and operate various lines of road as a part of their respective systems, which run into other States than Missouri; that some of the States, notably Kansas, Illinois, Colorado, Louisiana and Texas, have no such laws as that contemplated in the above act; and hence the latter, if enforced, will interfere with the proper and efficient management of the property of said defendants to the detriment of the public; and that by reason of the premises the State of Missouri is without jurisdiction to pass the act under consideration. Sec. 8, art. 1, Constitution of the United States; Howard v. Railroad, 207 U. S. 463; Adair v. United States, 208 U. S. 178; State v. Railroad, 212 Mo. 658.

*Elliott W. Major,* Attorney-General, for the State; *Lee B. Ewing* of counsel.

(1)    Every act of the Legislature, duly passed, is presumed to be valid and constitutional. The burden is upon him who seeks to attack its constitutionality to clearly show that it is violative of some constitutional provision. Ex parte Loving, 178 Mo. 203; State v. Cantwell, 179 Mo. 280; State v. Aloe, 152 Mo. 477; State v. Thompson, 144 Mo. 322; State ex rel. v. County, 144 Mo. 280; Railroad v. Andrews, 174 U. S. 96; Atkins v. Kansas, 191 U. S. 207. (2) Where these is a doubt as to the constitutionality of an act, it will be resolved in favor of the validity of the act. And no act of the Legislature will be deemed unconstitutional unless it appears so beyond a reasonable doubt. If reasonable minds might differ as to the constitutionality of legislation, it will be upheld as constitutional by the courts. State v. Cantwell, 179 Mo. 280; Ex parte Loving, 178 Mo. 203; State v. Able, 65 Mo. 357; County v. Griswold, 58 Mo. 192; Coal Co. v. State, 17 L. R. A. (W. Va.) 385; Atkins v. Kansas, 191 U. S. 207; Railroad v. Williams, 199 N. Y. 127; Munn v. Illinois, 94 U. S. 123. (3) The expediency or inexpediency of

an act is a question for the Legislature, and not for the courts. The judiciary cannot inquire into the motives and necessities which may have superinduced the passage of an act. Brown v. Cape Girardeau, 90 Mo. 383; County v. Griswold, 58 Mo. 192; State v. Hays, 49 Mo. 604; Bennett v. Boggs, 1 Baldwin (U. S.) 74; Atkins v. Kansas, 191 U. S. 207; Institute v. City, 183 N. Y. 151; Slack v. Jacob, 8 W. Va. 612; Coal Co. v. State, 17 L. R. A. 385; Munn v. Illinois, 94 U. S. 113. (4) The power of the Legislature is unlimited except by express terms of the Constitution, and the Legislature of Missouri has all the powers that belonged to the English Parliamant, except where there is plain constitutional restraint upon it. Ex parte Berger, 193 Mo. 24; Ex parte Roberts, 166 Mo. 212; County v. Jack, 49 Mo. 196; Munn v. Illinois, 94 U. S. 124. Those things that were subject to the police power at common law, are subject to the police power under the Constitution of this State, and of the United States. Ex parte Berger, 193 Mo. 26; State v. Wear, 145 Mo. 200; Patterson v. Bark, 190 U. S. 169; Mueller v. Oregon, 420; Coal Co. v. State, 17 L. R. A. 385; McLean v. Arkansas, 211 U. S. 539. (5) The act in question is a reasonable and valid exercise of police power. It tends toward the peace, good order, and welfare of society. Cooley's Const. Lim. (6 Ed.), 744; Constitution, sec. 5, art. 12; Luther v. Saylor, 8 Mo. App. 424; State v. Cantwell, 179 Mo. 254; Kerns v. Ins. Co., 123 Mo. 403; Shortal v. B. & D. Co., 45 Wash. 290; Cantwell v. State, 199 U. S. 642; McLean v. State, 211 U. S. 539; Mueller v. Oregon, 208 U. S. 410; Harbinson v. Iron Co., 183 U. S. 13; Holden v. Hardy, 169 U. S. 366; Frisby v. United States, 157 U. S. 160; Patterson v. Bark, 190 U. S. 169; State v. Mfg. Co., 18 R. I. 18; Skinner v. Mining Co., 96 Fed. Rep. 735; In re House Bill 1230 (Mass.), 28 L. R. A. 344; Comm. v. Dunn, 170 Mass. 140; Ferry v. Iron Co., 195 Mass. 548; Loan Co. v. Martell, 200 Mass. 485; Lawrence v. Railroad, 80 Vt. 370; Railroad v. Wil-

liams, 199 N. Y. 115; People ex rel. v. Metz, 193 N. Y.
148; People v. Lochner, 177 N. Y. 145; Coal Co. v.
State, 28 L. R. A. (Ky.) 273; Comm. v. Coal Co., 109
Ky. 47; Comm. v. Coal Co., 117 Ky. 885; Shaffer v.
Mining Co., 55 Md. 74; Coal Co. v. State, 17 L. R. A.
(W. Va.) 385; Hancock v. Hayden, 121 Ind. 366; Coal
Co. v. McGlosson, 166 Ind. 349; Book Co. v. Weissin-
ger, 160 Ind. 349; Railroad v. Baker, 4 Ind. App. 66;
Richie v. Wayman, 244 Ill. 509; Stave Co. v. State, 94
Ark. 27; Woodson v. State, 69 Ark. 521; Paul v. Rail-
road, 64 Ark. 83; Railroad v. Paul, 173 U. S. 404; Leep
v. Railroad, 58 Ark. 587; Lumber Co. v. Biddle, 87 Ark.
587; Munn v. Illinois, 94 U. S. 113; Magan v. Steele, 3
Ala. 60; Mobile v. Yuile, 3 Ala. 140; Jacobson v. Mas-
sac, 197 U. S. 366; Bacon v. Walker, 204 U. S. 311;
State v. Mueller, 48 Ore. 252; Parker v. Otis, 130 Cal.
326; Comm. v. Vrooman, 164 Pa. St. 306; State v.
Hann, 7 Kan. App. 510; State v. Waggoner, 77 Minn.
483; State v. Corbett, 57 Minn. 345; Pierce v. Kimball,
9 Me. 54; Wolf v. Smith, 9 L. R. A. (Ala.) 338; State
v. Mfg. Co., 34 Mont. 570. (6) In passing upon the
constitutionality of a given act of the legislative de-
partment of the Government, courts will give great
weight to history of contemporaneous legislation upon
such questions, and the fact that such legislation has
long stood upon the statute books unchallenged, is
strongly persuasive of its constitutionality. The law
is a progressive science, and adapts itself to changing
conditions. The Legislature is the representative body
of the Government, and, as all governmental power
emanates from the people, this representative body
has the right to declare the public policy of the State.
Muller v. Oregon, 208 U. S. 420; Patterson v. Bark,
190 U. S. 169; Coal Co. v. State, 17 L. R. A. (W. Va.)
385; State v. Loomis, 115 Mo. 324; Holden v. Hardy,
169 U. S. 387; Edwards v. Darby, 12 Wheat. 210; Sur-
gatt v. Lapiece, 8 How. 68; Mfg. Co. v. Furgeson, 113
U. S. 733; People v. Wright, 6 Colo. 92; McLean v.

Ark., 211 U. S. 539; Ex parte Loving, 178 Mo. 202. Some of. the laws of Missouri and other States, relative to wages of employees and time and manner of payment of employees by employer, are here cited. R. S. 1909, secs. 3019, 761, 3022, 3023, 8435, 8791, 7059, 8430, 7817, 7821, 7820; chap. 67, R. S. 1909; Washington, Laws 1905, p. 219; Arkansas, Laws 1905, c. 219, s. 1; Tennessee, Laws 1899, ss. 1 and 2, c. 11; Utah, Laws 1896, p. 219; United States, Act Congress, Dec. 21, 1898; New York, Laws 1905, 1909; Rhode Island, Pub. Stat., c. 220, ss. 1 to 9; California, Laws 1891, p. 195; Laws 1897, p. 231; Vermont, Laws 1906, pp. 114-117; West Virginia, Laws 1891, chs. 76, 82; Pennsylvania, Act of June 29, 1881, secs. 1 to 4; Indiana, Laws 1899; Laws 1885, p. 36; Kansas, Laws 1897, c. 145; Texas, Laws 1887, p. 72, chap. 52. For more than thirty years the Legislature of this State has exercised the right to regulate time of payment of wages. Various circuit courts, and at least some members of the Supreme Court of this State, have affirmed its constitutionality. Burnett v. Coal Co., 180 Mo. 241; McCarty v. O'Bryan, 137 Mo. 584. (7) Corporations have no natural rights. They are creatures of the law, and may be subject to regulations that might be objectionable, if applied to individuals. A corporation cannot complain of an act, because it might violate some right of natural persons. Luther v. Saylor, 8 Mo. App. 424; State v. Mfg. Co., 18 R. I. 16; Castillo v. McConnico, 168 U. S. 68; Comm. v. Vrooman, 164 Pa. St. 306. (8) Under the Constitution of Missouri, there is a reserve power in the Legislature to amend charters of corporations. Constitution, art. 4, sec. 53; Constitution, art. 12, sec. 2; 1 Thompson on Corporations (2 Ed.), sec. 402; 1 Beach on Private Corporations, secs. 36 and 37; Penn. College Cases, 13 Wall. 109. Charters of a corporation may be amended by a general act which does not refer specifically to such charters. Railroad v. Williams, 199

N. Y. 119; Institute v. City, 183 N. Y. 151; People ex rel. v. Gass, 190 N. Y. 323; College v. Kentucky, 211 U. S. 45; City v. Railroad, 6 Cush. 424; Railroad v. Smith, 47 Me. 34. This statute is valid as an amendment of corporate charters. Stave Co. v. State, 94 Ark. 27; Railroad v. Paul, 173 U. S. 404; Railroad v. Williams, 199 N. Y. 115; Lawrence v. Railroad, 80 Vt. 370. That which a State may do with corporations of its own creation, it may do with foreign corporations admitted into it. Ins. Co. v. Baggs, 172 U. S. 557; Hooper v. California, 155 U. S. 648.

BROWN, J.—The defendant was tried in the circuit court of Vernon county on October 14, 1911, and convicted of violating section 1 of an act of the 46th General Assembly entitled, "An Act requiring all corporations doing business in this State to pay their employees as often as semi-monthly, and fixing penalties for violation thereof." [Laws 1911, p. 150.]

By the judgment of the court, defendant was fined ten dollars, from which it appeals.

The information upon which the judgment below is based, charges that the defendant, a Missouri corporation, employed one Samuel Clark as a mechanic and car repairer, and refused to pay his wages as often as semi-monthly; contrary, etc.

No evidence was introduced by either party; but the facts were agreed upon by the following written stipulation:

"It is hereby stipulated and agreed between the parties to the above entitled causes, as follows:

"First. It is admitted that the facts set forth in each of the informations on file in the above cases against each of said railway companies are true.

"Second. It is admitted that since the 1st day of January, 1877, each of the said defendants owned and controlled lines of railroad running from the city of St. Louis, in the State of Missouri, and extending

across said State into the State of Kansas and other States.

"Third. It is admitted that each of said defendants, during all of said period, has been, and now is, engaged in interstate and intrastate commerce in each of the States into which its respective road extends."

The defendant seeks a reversal of the judgment, for the alleged reason that the Act of 1911 upon which the information is based, violates numerous provisions of our State and Federal Constitutions.

I. All the points urged against the constitutionality of the aforesaid Act of 1911 will receive consideration in this opinion; but the last point urged, being of a very general nature, will be first considered. Said last point is as follows:

"Because said act is unreasonable, unjust, oppressive, is without benefit to the persons named as beneficiaries, is paternalistic in its nature and tendencies, is special class legislation, destroys the right to make legitimate contracts, and, in short, was enacted to harass and annoy the railroads of this State, and is clearly devoid of a single redeeming feature."

To support this point, the defendant cites the 178th section of Tiedeman on Limitations of Police Power, as follows:

"But in this country where suffrage is universal, and the wage-earners constitute a vast majority of the voters, if they are unable to assert their claims without the aid of law, they cannot do so with its aid. And thus their inefficacy confirms the unconstitutionality of laws which are designed to protect the workman against the oppression of the employer. Laws, therefore, which are designed to regulate the terms of hiring in strictly private employments, are unconstitutional, because they operate as an interference with one's natural liberty in a case in which there is no trespass upon private right, and no threatening in-

jury to the public. And this conclusion not only applies to laws. regulating the rate of wages of private workmen, but also any other law, whose object is to regulate any of the terms of hiring, such as the number of hours of labor per day, which the employer may demand. There can be no constitutional interference by the State in the private relation of master and servant except for the purpose of preventing frauds and trespasses.''

After mature consideration, we are not able to concur in the views announced by Professor Tiedeman. His broad statement of the limitation of police power followed to its logical conclusion, would invalidate all laws against usury and legalize all contracts which the master might see fit to make with its servants, even though such contract amounted to peonage. Such a doctrine might be sound law in Mexico; but it has no proper place in the jurisprudence of a State whose citizens are free both in name and in fact.

To say that the law upon which we are now required to pass judgment ''is without benefit to the persons named as beneficiaries . . . and was enacted to harass and annoy the railroads of this State and is clearly devoid of a single redeeming feature,'' would be to not only ascribe to the legislative department of our State a spiteful and malevolent desire to annoy those engaged in a legitimate enterprise highly beneficial to the public, but to make such a ruling we would have to ignore the everyday experience of mankind, of which courts are compelled to take judicial notice.

It is a matter of common knowledge that those who pay their debts promptly are respected and considered material benefactors of the communities in which they reside; while those who pay their debts irregularly or not at all, are looked upon with contempt, and receive the maledictions of all with whom they come in contact.

With this much judicial knowledge at hand, how can we assume that a law intended to promote the prompt payment of debts is in nowise beneficial to those who will, under its provisions, receive their wages more promptly than heretofore? This court takes judicial notice of the fact that a very large majority of the people of this country are now and probably always will be compelled to earn their livelihood "by the sweat of their brow;" consequently, the all important question to most people is how to obtain work and the wages which work brings.

Another self-evident fact is that the laborer is usually a man of small means and limited credit. The fact that he has little or no property to secure those of whom he would ask credit, makes it very important to him that he should receive his wages promptly and at frequent intervals; otherwise, the little which he hath may go to enrich the extortioner, the pawn broker or chattel mortgage usurer.

The necessity for prompt payment of wages seems to have been recognized by those who wrote laws in ancient times.

"The wages of him that is hired shall not abide with thee all night until the morning." [Lev. 19: 13.]

"At his day thou shalt give him his hire. Neither shall the sun go down upon it; for he is poor and setteth his heart upon it; lest he cry against thee unto the Lord, and it be sin unto thee." [Duet. 25: 15.]

That both laborers and those from whom they purchase their supplies will be benefited by such laborers receiving their wages semi-monthly instead of monthly, as heretofore, is too self-evident a proposition to deserve serious thought.

The allegation of defendant that the law in judgment "was enacted to harass and annoy the railroads of this State," does not raise any issue of which this court can take cognizance. In the absence of some-

242 Sup.—23

thing more definite than mere assertion, we are not justified in holding that the representatives of three-and-a-quarter million people acted from improper motives.

Whether a law is wise or unwise is a matter over which we have no control. In passing upon this very question in the case of State ex rel. v. Vandiver, 222 Mo. l. c. 239, Woodson, J., speaking for this court in Banc, said: "In my judgment, the act in question, as before stated, is but the lawful exercise by the Legislature of the police power of the State. *Whether or not this particular act is wise or unwise, does not. concern the courts,* without it is violative of the State or Federal Constitution."

The only real issues in this case are whether or not the Constitution of the United States and of the State of Missouri will permit the Legislature to regulate the private contracts of artificial and natural persons; and if so, whether the law in question is a reasonable exercise of the police power of the State.

The validity of the law in judgment can only be sustained on the theory that it comes within the purview of the police power.

The exercise of such police power as is essential to promote the health, morals and welfare of the people seems to be vested in every sovereign State.

The Constitution of Missouri adopted in 1820, article 13, section 2, contains the following provision: "That the people of this State have the inherent, sole and exclusive right of regulating the internal government and *police* thereof, and of altering and abolishing their Constitution and form of government whenever it may be necessary to their safety and happiness."

The essential provisions of the foregoing section of our first Constitution have been incorporated in every subsequent revision of that document; and those

provisions are now a part of section 2, article 2, Constitution of 1875.

In 1875 that part of our Constitution relating to corporations was revised, and the following clause was added thereto:

"Sec. 5, art. 12. The exercise of the police power of the State shall never be abridged, or so construed as to permit corporations to conduct their business in such manner as to infringe upon the equal rights of individuals or the general well-being of the State."

We cannot see that the foregoing enactment materially changed or enlarged the general police power as it had existed from the creation of our State. It was merely a constitutional declaration that the police power shall not be *construed* so as to exalt the rights of corporations above those of natural citizens or so as to disturb the general well-being of the State.

The police power of the State is somewhat difficult of precise definition. In its very nature it must be somewhat elastic to meet the changing and shifting conditions which from time to time arise through the increase of population and complex commercial and social relations of the people. A law may be altogether invalid in a certain locality because it amounts to an unreasonable exercise of the police power of the State; yet ten years subsequent to the date of its enactment, said invalid law may become a wise and necessary regulation, on account of the changed condition of the people and locality upon which it is intended to operate.

We take judicial notice of the fact that in order to procure the service of desirable employees, many corporations in this State voluntarily pay their employees weekly; but we have no judicial knowledge that such method of payment works injuriously either to the employer or employee.

By this statement we do not wish to be understood as indicating that we think a law which would

require railroad corporations to make weekly payments, would be a reasonable exercise of police power, their employees being scattered across the entire State.

We have already seen that it does not injure defendant's employees to require payment of their wages semi-monthly; but on the contrary, tends strongly to promote their welfare. However, defendant contends that it will be required to expend $28,000 monthly in paying its employees semi-monthly instead of monthly, as heretofore, and therefore will be needlessly injured to that amount.

It is a self-evident fact that it requires some more expense on the part of defendant to make an additional payment of wages each month. Just how much that additional expense will be, could have been shown by evidence; but was not; and is therefore left to be ascertained by the mere assertion of the attorneys, or the judicial knowledge of the court.

The record in this cause does not show any facts which indicate that the semi-monthly payment law will necessarily injure defendant or prove so oppressive to corporations as to render it an unwarranted exercise of the police power of the State.

We therefore hold the police power of the State justified the enactment of the semi-monthly payment law, provided said law does not directly contravene some provision of the State or Federal Constitution.

II.  It must be remembered, however, that the exercise of the police power cannot be made a cloak under which to overthrow or disregard constitutional rights.  [State v. Schlenker, 112 Ia. 642, l. c. 646.]

In the investigation of this branch of the case, we must also bear in mind that it is our duty to so construe both the Constitutions and the statute as to give effect to each, if they will reasonably bear such

a construction. [People v. Rosenberg, 138 N. Y. 410.]

Defendant's first attack upon the constitutionality of the semi-monthly payment law is as follows:

"Said act, violates section 4 of article 2 of the Bill of Rights of the Constitution of Missouri, 1875, in this, that it deprives the defendant of its natural right and liberty to contract, and likewise deprives it of the gains of its own industry."

The foregoing point may be properly classified with the following additional points:

"Said act violates section 30 of article 2 of the Constitution of Missouri, 1875, in this: that it deprives defendant of its property without due process of law, and regardless of expense, regardless of any contract of employment, and without any reason or necessity therefor, destroys one of defendant's most valuable assets conferred by its charter, to-wit: the right to contract and employ labor upon any reasonable terms agreed upon.

"Said act violates section 1 of article fourteen of the amendments to the Constitution of the United States, in this: that it denies to defendant the equal protection of the laws, attempts to take defendant's property without due process of law, and denies to it the right to contract for labor in respect to matters which do not affect the health, safety or public welfare of said employees, and which said contracts are neither contrary to public policy nor to any law of the land."

To support the foregoing propositions, defendant cites the following decisions of this court: State v. Loomis, 115 Mo. 307; State v. Julow, 129 Mo. 163; State v. Tie & Timber Co., 181 Mo. 536; State v. Miksicek, 225 Mo. 561.

In the Loomis case, 115 Mo. 307, a statute which prohibited persons and corporations engaged in the business of mining and manufacturing from issuing

for the hire of their employees, orders or checks, redeemable only in goods, and refusing to pay such orders or checks in cash, was adjudged unconstitutional.

A statute prohibiting the issue of non-negotiable checks or orders in payment of labor performed for persons, firms or corporations was also adjudged unconstitutional in the case of State v. Tie & Timber Co., 181 Mo. 536.

In the Julow case, 129 Mo. 163, a statute prohibiting employers from entering into any contract with their employees which required said employees to refrain from joining labor unions, was adjudged invalid.

In the Miksicek case, 225 Mo. 561, a statute prohibiting bakers from working their employees more than six days during any one calendar week was held to violate the Fourteenth Amendment to the Constitution of the United States.

Defendant also cites the dissenting opinion of Graves, Valliant and Fox, JJ., in the case of Ex parte House v. Mayes, 227 Mo. 617, in which case a majority of this court held that a statute prohibiting dealers in grain, hay, seed and coal from making any deduction from the actual weight of commodities sold by them, was constitutional.

It will be observed that none of the Missouri cases cited by appellant construe statutes of the same purport as the one on which we are now called upon to pass judgment, although some of those statutes possess features quite similar to the one now under consideration.

In some of the cases cited the language used strongly indicates that this court as then constituted would have condemned as unconstitutional a semi-monthly payment law if it had been called upon to do so. For instance, in the Loomis case, 115 Mo. 307, written in 1893, Black, J., speaking for the ma-

jority of this court, said: "Liberty, as we have seen, includes the right to contract as others may; and to take that right away from a class of persons following lawful pursuits is simply depriving such persons of a time-honored right which the Constitution undertakes to secure to every citizen. Applying the principles of constitutional law, before stated, we can come to no other conclusion than this, that these sections of the statute are utterly void. They attempt to strike down one of the fundamental principles of constitutional government. If they can stand, it is difficult to see an end of such legislation, and the government becomes one of special privileges, instead of a compact 'to promote the general welfare of the people.' We place our conclusion on the broad ground that these sections of the statute are not 'due process of law' within the meaning of the Constitution."

While we regard the above cited cases as persuasive authority, they are not precedents which have binding force upon us in this case, because the statute attacked in this case is not the same as those adjudged unconstitutional in the other cases.

It is unsafe for attorneys or courts to treat the phrases or language used by appellate judges in arriving at their decisions with the same binding force as though they were parts of the Decalogue; for it is a well known fact that both courts and individuals are prone to express views by way of *obiter dicta* which if construed literally in some other case where a different state of facts exists, would produce confusion, injustice and perversion of the law.

For instance, if a man residing in a mountainous locality where there were no good roads was asked by his neighbor what kind of outdoor exercise he considered most pleasant, the reply would doubtless be horseback riding; yet this advice would not indicate that the giver thereof would not himself choose

an automobile instead of a horse if he were living in a locality where all the roads were level and solid.

The lack of binding effect of *obiter dicta* when used in judicial opinions is fully and ably discussed by brother LAMM in the case of State ex rel. Bixby v. City of St. Louis, recently decided by this court, In Banc, 241 Mo. 231, in which opinion all the judges of this court concurred.

The defendant's attorney with great diligence and industry has called our attention to the decisions of the appellate courts of three States holding that it is beyond the power of Legislatures to prescribe how often employees of persons or private corporations shall be paid. Cases cited are: Godcharles v. Wigeman, 6 Atl. (Pa.) 354, 113 Pa. St. 431; Johnson v. Goodyear Mining Company, 59 Pac. (Cal.) 304, 127 Cal. 4; Republic Iron & Steele Co. v. State, 66 N. E. (Ind.) 1005, 160 Ind. 379; Toledo, etc. Ry. Company v. Long, 82 N. E. (Ind.) 757, 169 Ind. 316.

The courts which decided the above cases are all highly respected; and their views are entitled to much consideration; but upon an inspection of their opinions, we see that they proceeded along very much the same line of reasoning as Professor Tiedeman at section 178 of his Treatise on the Limitation of Police Power, and Judge BLACK in the Loomis case, 115 Mo. 307; that is, they hold that the State and Federal Constitutions, while containing no express language indicating an intent to limit the police power, do in fact so curtail and abridge that power that no State may enact any law regulating private contracts between its citizens, even though such laws are needed to protect the weak from the strong and prevent wealthy and provident persons and corporations from making harsh, usurious or unjust contracts with their less provident neighbors.

In Godcharles v. Wigeman, 113 Pa. l. c. 437, it was said: "The first, second, third and fourth

sections of the Act of June 29, 1881, are utterly un-
constitutional and void, inasmuch as by them an at-
tempt has been made by the Legislature to do what,
in this country, cannot be done; that is, prevent per-
sons who are *sui juris* from making their own con-
tracts.   The act is an infringement alike of the right
of the employer and the employee.   More than this,
it is an insulting attempt to put the laborer under
a legislative tutelage, which is not only degrading to
his manhood, but subversive of his rights as a citizen
of the United States.   He may sell his labor for what
he thinks best, whether money or goods, just as his
employer may sell his iron or coal; and any and every
law that proposes to prevent him from so doing is an
infringement of his constitutional privileges, and con-
sequently vicious and void.''

We find ourselves unable to agree to the doctrine
announced in those cases which hold that the State
has no power to prescribe how often the wages of
employees shall be paid.

Ever since the hungry Esau sold his birthright
for a ''mess of red pottage'' (Gen. 25:32), men, in
rapidly increasing numbers have, when weak from
lack of food, been willing to enter into any contract
which seemed likely to put bread in their mouths or
supply the immediate wants of their families.

According to the logic of those cases upon which
defendant mostly relies, Constitutions were intended
to serve as chains or shackles upon the people of the
State, to prevent them from enacting such laws as
will abridge the right of the cunning or powerful to
oppress the weak.   . .

Of course the State has not an unlimited power
to regulate private contracts between its citizens, but
its power to do so must necessarily grow and expand
from time to time as the complex commercial and
social relations of its citizens multiply; and whether
any particular statute is a reasonable and necessary

exercise of its police power, must be determined by the courts.

More than four hundred years ago statutes were enacted in England requiring manufacturers to pay their employees in currency of the realm instead of goods. This was done on the theory "that when two classes of persons are dealing together and one class, generally speaking, is weaker than the other, and liable to oppression either from natural or accidental causes, the law should, as far as possible, redress the inequality by protecting the weak against the strong." [110 Eng. Com. Law Reports (2 Best and Smith) l. c. 83.]

While the above mentioned statutes did not become a part of the common law adopted in Missouri, their operation and beneficial effect must have been known to our forefathers in 1820 who had recently been subjects of the mother country; and to the mind of the writer, it is not possible that the framers of our Constitution intended to dispense with such a just and necessary police power by the adoption of a Constitution which contains no express provisions manifesting such intent.

We are not without precedent in this country in the matter of legislative supervision over contracts and litigation between parties who are not on the same financial footing.

In the case of Seaboard Airline Railway Company v. Seegers, 207 U. S. 73, the Supreme Court of the United States upheld the validity of a statute of South Carolina penalizing transportation companies in the sum of fifty dollars for failure to adjust claims for damages within forty days. In this case the claim was only one dollar and seventy-five cents. The court held that small claims were the kind that the law was intended to cover and protect; claims so small that the holder thereof could not afford to go to law.

In the case of Farmers and Merchants' Insurance Company v. Dobney, 189 U. S. 301, a statute of Nebraska prescribing a penalty on fire insurance companies for negligently refusing to settle claims based upon a total loss of the property destroyed, was held not to violate the Fourteenth Amendment to the . Constitution of the United States; and this was done on the theory that the party who had sustained the total loss of the insured property was not on an equal footing with the insurance company in litigating his claim for the loss.

A similar statute of our own State (Sec. 7068, R. S. 1909) fixing penalties for vexatious refusal to pay either fire or life insurance policies according to contract, was upheld by this court (Keller v. Home Life Insurance Company, 198 Mo. 440), and by the United States Court of Appeals of the Eighth District (Williamson v. Liverpool, etc., Insurance Company, 141 Fed. 54).

Under the rules announced in the foregoing cases, if the General Assembly may, on account of the unequal situation of laborers and their corporate employers, fix the time for paying wages, it may with equal propriety prescribe fines and penalties to compel the payment of such wages.

Our learned Attorney-General and the prosecuting attorney of Vernon county have called our attention to the following cases: State v. Brown, 18 R. I. 16, wherein the Supreme Court of Rhode Island adjudged a law requiring the weekly payment of wages of employees to be no infringement upon the fifth article or Fourteenth Amendment to the Federal Constitution; and the case of New York Central Railroad Co. v. John Williams, Commissioner of Labor, rendered in 1910, 199 N. Y. 108, upholding the constitutionality of a law requiring the semi-monthly payment of employees. They also call our attention to the very recent case of Arkansas Stave Company v.

State, 94 Ark. 27, wherein a law requiring all corporations in the State of Arkansas to pay certain of their employees semi-monthly, was assailed as unconstitutional. That law was enacted in 1909, and is very similar to the one now under consideration. It is as follows:

"Section 1. All corporations doing business in this State who shall employ any salesmen, mechanics, laborers or other servants for the transaction of their business, shall pay the wages of such employees semi-monthly.

"Section 2. Any corporation that shall through its president, or otherwise, violate section one of this act shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in any sum not less than fifty dollars, nor more than five hundred dollars for each offense."

The Stave Company assailed the validity of the above law on many of the same grounds urged by defendant against the Missouri statute now under consideration; therefore, we will quote part of the decision of the Arkansas Supreme Court:

"The right freely to acquire property and liberty to make contracts in respect thereto and in regard to one's business is fundamental, and it has been often held that this right and liberty is under the protecting power of this clause of the Fourteenth Amendment. But, even in the case of individuals, it has been also held that the right to make contracts is not absolute, and that it is subject to certain limitations which the State may impose. As is said by Mr. Justice Brewer in the case of Muller v. Oregon, 208 U. S. 421: 'It is undoubtedly true, as more than once declared by this court, that the general right to contract in relation to one's business is part of the liberty of the individual, protected by the Fourteenth Amendment to the Federal Constitution; yet it is equally well settled that this liberty is not absolute

and extending to all contracts, and that a State may, without conflicting with the provisions of the Fourteenth Amendment, restrict in many respects the individual's power to contract.

"In a state of organized society, every member surrenders something of his absolute and natural rights. 'Every man,' says Blackstone, 'when he enters into society, gives up a part of his natural liberty.' It has been said that the right of property is even higher than any constitutional sanction; and, while this expression represents the sacredness of property and the rights to acquire and deal with it, still it is not entirely beyond the control of the State—of its Legislature and laws, whose protection its possessor and owner seeks for its safety and preservation. . . .

"These corporations represent aggregations of capital, and the employees are the laborers who are dependent on their wages for their livelihood. The inconvenience to the corporation to pay the wages semi-monthly could not be as great as it would be to those whose actual necessities require the frequent payments, not to receive such payment. The corporation has already received the full value for which it is required to pay, and this requirement to pay semi-monthly the wages of its employees already earned could not substantially impair or destroy the object or purpose of its incorporation. If the Legislature in its wisdom thought that by the more frequent payment of the wages to the laborer, better service would be secured for the corporations, and the objects of their creation thus advanced, it would be reasonable and just to require such frequent payments. This would not be considered oppressive or wrong. We cannot say that this act is an unreasonable exercise of the power of the Legislature. We only pass upon the power of the legislative body of the government to act; of the wisdom, propriety and policy of such

act, under our system of government, the Legislature must solely judge. [Cooley on Const. Lim. (6 Ed.) 479.]

"Nor does this act deny to the defendant the equal protection of the law. It applies to all corporations. Within the sphere of its operation, all artificial persons are treated alike under like circumstances and conditions. Because the act only applies to corporations, and not to natural persons, it does not contravene the equal protection clause of the Federal Constitution. Nearly all legislation is special, either in the objects sought to be attained or in its application to classes. And the general rule is that legislation does not infringe the constitutional right of equal protection where all persons, whether natural or artificial, of such class, shall be treated alike under like circumstances and conditions. In the case of Missouri Pac. R. Co. v. Mackey, 127 U. S. 205, Mr. Justice FIELD, speaking of this provision of the federal constitution, says: 'Such legislation does not infringe upon the clause of the Fourteenth Amendment, requiring equal protection of the laws because it is special in its character. . . . And when legislation applies to particular bodies or associations, imposing upon them additional liabilities, it is not open to the objection that it denies to them the equal protection of the laws if all persons brought under its influence are treated alike under the same conditions.' [Orient Ins. Co. v. Daggs, 172 U. S. 557; St. Louis & San Francisco R. Co. v. Matthews, 165 U. S. 20; McLean v. Arkansas, 211 U. S. 239.]

"It is also urged that the act is invalid because it restricts the rights of the defendant's employees to contract with it. But it is the established doctrine of the law that the liberty of contract is not universal and is subject to restrictions passed by the legislative branch of the government in the exercise of its power to promote the safety, health and welfare of the people..

The right to contract is often limited by the law, and
certain contracts are prohibited by statute. It is fun-
damental that the Legislature may declare what per-
sons are competent to enter into a contract. Thus,
persons under disability cannot enter into a binding
contract. Contracts cannot be made in restraint of
trade, and contracts against public policy are void.
The Statute of Frauds enables contracting parties to
avoid contracts not in writing; a party will not be
allowed to contract to waive the benefit of homestead
or exemptions; and a married man cannot convey his
homestead without his wife joining in the execution
of the conveyance. These instances, and many others
that might be mentioned, show that the lawmaking
power of the State may restrict the right to contract.
But under this act the restriction of the employee's
right to contract is not direct. That restriction only
applies to the corporations, and those dealing with
them cannot complain of the incompetency of the cor-
porations to make contracts which are inhibited by the
law, any more than they could in making contracts
with persons laboring under legal disabilities, or in
contracting relative to subject-matters prohibited by
law. [Lawrence v. Railroad Co., 80 Vt. 370; State v.
Brown & Sharp Mfg. Co., 18 R. I. 17.]''

      After mature deliberation, and careful considera-
tion of the authorities cited by both parties, we are
convinced that the semi-monthly payment law is not in
conflict with section 4, article 2, or section 30, article
4, of the Constitution of Missouri, nor with section 1
of the Fourteenth Amendment of the Constitution of
the United States.

      III. Defendant also asserts that said act violates
section 10 of article 2 of the Constitution of Missouri,
1875, in this: that said section provides that the
courts of justice shall be open to every person and
certain remedies afforded for every injury to person,

property or character, and that right and justice shall
be administered without sale, denial or delay; whereas,
said act, in violation of said last quoted provision of
our Constitution, denies to defendant the right to make
and enforce an ordinary, simple, everyday contract
for employment of labor, or to fix the time and amount
of payment; it denies to defendant the right to assert
in a court of justice the enforcement of such contract,
and compels defendant, regardless of expense or any
corresponding benefit to the employee, to pay the
employee's wages twice in each month, and that, too,
whether requested or not.

We see no merit in this assignment. It has been
fully covered by our opinion under point 1.

IV. Defendant further contends that said act
violates section 20 of article 2 of the Constitution,
1875, of Missouri, in this: that it attempts to take
defendant's private property and appropriate the
same to the private use of certain of its employees,
and that, too, without compensation, justification or
excuse therefor.

That said act violates section 21 of article 2 of
the Constitution of Missouri, 1875, in this: That it
attempts to take the private property of defendant
and to turn the same over to the employee under the
guise of its being for public use, without compensa-
tion, when as a matter of fact there is no public use
involved.

The above assignments are likewise without
merit. There is no similarity between the condemning
of property and compelling a party to pay a debt to
one who has already earned the same by his labor.

V. Defendant's fifth assignment is as follows:
"Said act violates section 15 of article 2 of the
Constitution of Missouri, 1875, in this: that it im-
pairs the obligations of reasonable and fair contracts

entered into between defendant and its employees. It likewise grants irrevocable privileges to certain employees of defendant and other corporations in requiring semi-monthly payment of their wages, when others similarly situated are deprived of such privilege.''

The semi-monthly payment law is in no sense *ex post facto* or retrospective.

It is not shown or even contended that defendant entered into a contract to pay its employees monthly before the law was enacted; neither does the law amount to an irrevocable grant of special privilege. Even if it were or could be classified as a special privilege, the ''privilege'' may be revoked by any subsequent Legislature or by the people through initiative petitions and an election for that purpose.

VI.   Defendant's sixth point of attack is as follows:

''Said act violates section 28 of article 4 of the Constitution of Missouri, 1875, in this: that in its title it includes all employees of all corporations in the State of Missouri, while in the body of the act it is misleading, indefinite and uncertain and only extends the special privileges to mechanics, laborers and other servants.''

We think this point is unsound. A title which was broader than the statute enacted thereunder could not mislead anyone. The effect of such title would be to convey notice not only to those really affected by the law, but also to others not concerned in its passage. The cases cited by defendant all pertain to and construe laws which did have a misleading title; laws which were broader than the titles to the bills by which they were enacted.

VII.   Defendant further contends that said act violates section 53 of article 4 of the Constitution of Missouri, 1875, in this: that it is special or class

242 Sup.—24

legislation, as shown by the body of said act, and does not relate either to the health, safety or public welfare of the employees named therein, nor does it show that they occupy any different position from that of any other mechanic, laborer or other servant not employed by corporations.    That said act is a species of class legislation in which corporations, including defendant, are discriminated against without any reason or necessity therefor.

This point presents an important issue.    Class legislation is specifically prohibited by the Missouri Constitution.    Persons and things of a natural class cannot without some good reason be separated or erected into artificial classes.

The act under consideration requires all corporations to pay their employees semi-monthly, but does not require private individuals or partnerships who employ laborers in the same manner or in the same fields of industry to make such semi-monthly payments.    Is there any valid reason for this discrimination?

We think there is.

Persons performing labor for individuals usually maintain some degree of personal acquaintance with their employers and know their business ability and reputation for paying their debts.    If the employer be a successful man, entirely honest, his laborers can with a fair degree of safety, depend upon getting their wages, even though they do not receive same semi-monthly.    It is a well know fact that many men with little or no means pay their debts promptly, and will not incur obligations which they cannot meet. Other men who could pay their debts contrive in some way to avoid doing so; therefore, the laborer who works for an individual can usually ascertain whether he can safely depend upon that individual to pay him.

Besides this, all the property which an individual may acquire during his lifetime, after incurring labor debts, will become liable for the payment of such debts, unless the debtor applies to a bankruptcy court to blot out his obligations; and not many men have sought or will likely seek to free themselves from the obligation of labor debts in that manner.

With corporations, the situation is different. Their employees frequently do not know who the shareholders are. Corporations are invariably managed by agents, and those agents often have no personal interest in the success of the business which they are employed to supervise. Corporations are usually allowed to continue their operations long after they become insolvent; and frequently when they do fail their employees lose a considerable amount of the wages they have earned; and thereby much suffering and want is brought upon them and their dependents. In working for corporations, the laborer has nothing but the corporate property to look to for his wages; and if its property be mortgaged and the corporation fails or is placed in the hands of a receiver, he often loses his wages, or is forced to wait for them indefinitely.

Individuals who employ laborers do not so often continue in business after they begin to lose money and are in danger of failing, for the individual employer knows that his private property, present and prospective, is likely to be consumed for labor debts.

The stockholders or owners of corporations stand on a diffrent footing. Stockholders who have paid their stock in full are not liable for debts of the corporation. More frequently than otherwise, agents of corporations do not keep the shareholders fully informed of its financial condition, so that when a failure occurs, such stockholders feel under no obligation to go down into their private purses to pay the em-

ployees; and being under no legal duty to do so, they allow the laborers to go empty handed.

The foregoing reasons furnish ample warrant to the Legislature for its action in making a separate class of those persons who labor for corporations and for requiring that such laborers be paid semi-monthly.

Such a vast per cent of the business of this State is conducted by corporate investments that a law which will regulate payment of wages by corporations will practically regulate individuals and firms who also employ labor on a large scale; because no individual will be able to treat his employees with less consideration than his corporate neighbor; otherwise, his laborers may quit his employ and seek service with corporations, which are, by the law under consideration, compelled to pay their servants semi-monthly. These views find support in the case of Arkansas Stave Company v. State, 94 Ark. 27.

VIII.   Defendant's next assignment is as follows:

"Said act is in conflict with section 8 of article 1 of the Constitution of the United States, and the various laws passed by Congress thereunder, in this; that defendant is engaged in interstate commerce and owns and operates various lines of road as a part of its system, which run into other States than Missouri; that some of the States, notably, Kansas, Illinois, Colorado, Lousiana and Texas have no such laws as that contemplated in the above act, and hence the latter, if enforced, will interfere with the proper and efficient management of defendant's property to the detriment of the public; and that, by reason of the premises, this State is without jurisdiction to pass the act under consideration."

There is nothing in this record to indicate that other States through which defendant operates its railroad have not the same law as to semi-monthly

payments that we have.  No reason is apparent why we should infer or find that semi-monthly payment of wages would interrupt or interfere with interstate commerce over defendant's road.  Our attention has not been called to any act of Congress regulating the time of payment of the wages of laborers engaged in interstate commerce.

If defendant had produced evidence that any considerable portion of its employees would become dissatisfied and quit its service because they are paid or tendered their wages semi-monthly instead of monthly, this point would receive careful consideration; but as we are of the opinion that the semi-monthly payment of wages will tend to attract laborers to defendant rather than drive them away from it, we rule this point against defendant.  [N. Y. C. & H. R. R. Co. v. Williams, 199 N. Y. 108.]

IX.  Another objection to the law under consideration is that said act is in conflict with section 10 of article 2, Constitution of the United States, and if enforced, will destroy the right of defendant to make legitimate contracts with its employees in respect to matters which are not a violation of any criminal law, and which do not relate in any manner to the safety, health or public welfare of such employees.

As we have heretofore found that the law does tend to promote the welfare of defendant's employees and the general public, and is not needlessly injurious or oppressive to corporations, it must follow that if it be constitutional, no valid contract can be made in this State which conflicts with its provisions.  Hence, this, objection may be safely disregarded.

X.  Defendant also earnestly complains that the semi-monthly payment law is void because it operates as an amendment of defendant's charter granted prior

to 1875; that the Constitution does not permit any such amendment by the Legislature.

In its reply brief, defendant's attorneys insist that the decision of the Supreme Court of Arkansas upholding a semi-monthly payment law of that State, is based upon the fact that the Constitution of Arkansas reserves the power to amend the charters of corporations. Said article of the Constitution of Arkansas reads as follows:

"Corporations may be formed under general laws, which laws may, from time to time, be altered or repealed. The General Assembly shall have the power to alter, revoke or annul any charter of incorporation now existing and revocable at the adoption of this Constitution, or any that may hereafter be created, whenever, in their opinion, it may be injurious to the citizens of this State, in such manner, however, that no injustice shall be done to the corporators."

We are at a loss to see how the above quoted reservation to amend charters could be made a ground for upholding the validity of a statute which would, as claimed both in that case and this, work an injury or injustice to corporations. If in that case the law assailed did no "injustice to the corporators," then it might well have been sustained under the police power, wholly independent of the constitutional provision regarding the amendment of corporate charters hereinbefore set out.

Whether the Legislature of Missouri has reserved the power to amend charters of corporations is a point which we do not deem necessary to decide in this case. We can safely uphold the constitutionality of the semi-monthly payment law under the general police power of the State. This power, as we have heretofore decided, was announced and fully preserved in section 2 of article 13, Constitution of 1820, and at no time since that date has it been suspended or placed in abeyance. If the act in question really

amended the charter or abridged defendant's rights in such manner as to unnecessarily and materially diminish its power to profitably operate its railroad in Missouri, the issue would be different.   There is no logical reason for contending that when a corporation is admitted into a State or is chartered by a State an implied contract arises between that corporation and the State that no subsequent Legislature shall ever pass any act which in any manner affects the business of such corporation.

A great deal of law has been written on the subject of amending charters of corporations; but we are of the opinion that neither corporations nor citizens of the State have any vested right in its statutes. Their property rights acquired under its statutes or under the Constitution may not be taken away by an amendment or a new statute; but when the general welfare of a State demands a new law, and one is enacted which operates prospectively, no citizen, natural or artificial, will be heard to complain.

Judge Cooley, in his work on Constitutional Limitations (7 Ed.), p. 402, says: "Citizens have no vested right in the existing general laws of the State which can preclude their amendment or repeal, and there is no implied promise on the part of the State to protect its citizens against incidental injury occasioned by changes in the law."

Any law which would really prevent the defendant from operating its railroad as a common carrier, or which would render it impossible for such road to be operated so as to yield a return on the money invested in its construction or equipment, would doubtless be void; but after full consideration of all the facts and issues presented in this case, we are of the opinion that the semi-monthly payment law applicable to all corporations, is an appropriate and necessary police regulation; and there is no sound reason why it

should prove injurious to defendant or other corporations in our State.

By common consent, in all civilized communities, an implied duty rests upon the State to aid those unfortunates who through sickness, old age, extreme poverty or other mischance are unable to supply themselves with those things which are necessary for their continued existence, and consequently any law which encourages people to work by holding out assurances that they shall promptly receive the wages they may earn, whether financially able to go to law or not, tends to encourage honest effort, and helps to build up an industrious, thrifty and self-respecting people, who, instead of becoming paupers, will be able to pay their debts, and being protected by the State in their efforts to better their condition, will have a direct interest in maintaining their protector, and in its good order, morals and general welfare.

The judgment is affirmed. *Valliant, C. J.,* and *Woodson* and *Kennish, JJ.,* concur; *Graves, Lamm* and *Ferriss, JJ.,* concur in the result, in a separate opinion by *Graves, J.*

## SEPARATE OPINION.

GRAVES, J.—I concur in the result reached by our Brother BROWN, but for reasons which may in a considerable measure differ from those expressed in the principal opinion.

I agree that this court has gone a long way when it comes to the question of the classification of subjects of legislation. [White v. Railroad, 230 Mo. 287.]

Under the recent White case, supra, we can hardly say that the placing of corporations in a class to themselves, is an unreasonable classification made by the Legislature. The rulings recently have at least gone that far. The classification made by the law under

review in this case is certainly not more radical than the one under review in the White case, supra. In the White case, we said:

"It is impossible to make all laws applicable to all persons or corporations; classes in fact exist, and the laws must be made to apply to them as classes. The General Assembly does not really create the class, although we usually speak of it in that way. The class exists by its very nature or inherent conditions, and the lawmaker recognizes the fact and makes the law to suit. If there is reason why a law should be made to apply to a particular class, the lawmaking depart-ment of the State government has authority to make it unless it is otherwise prohibited by the Constitution. [Humes v. Railroad Co., 82 Mo. 231; Daggs v. Insurance Co., 136 Mo. 382; Geist v. St. Louis, 156 Mo. 647; Hamman v. Coal Co., 156 Mo. 232; State ex rel. v. Henderson, 160 Mo. 216.] Those are a few of the decisions on this subject, but are not all that have been cited by the learned counsel for appellant, as reference to their briefs will show; but they are sufficient."

The principal opinion recites many reasons for the classification, and others might be assigned, but if the law in question is otherwise valid, it can hardly be said it is invalid because it places corporations in a class to themselves. As said, our more recent rulings would uphold this law as against such an attack.

The more serious question in this case is whether or not the law so infringes upon the right to contract as to make it invalid. If it were a question of first impression, we would be loth to say that the law did not unnecessarily infringe upon this right. The right to contract is one which belongs to every person, whether he be employer or employee, whether he be rich or poor, or whether he be individual or corporation. We should not so write the law that the employee may not enter into proper contracts if he so

desires. There can be no contract without two con-
tracting parties. When by the law we bar the em-
ployer from making full and complete contracts, we
likewise bar the employee. When we sustain a law
which bars freedom of contract upon the part of the
employer, we must remember that we might have to
pass upon a law which would bar the freedom of con-
tract upon the part of the employee. It is a serious
question to interfere by legislation with the right of
freedom to contract, and it is only under the police
power, which looks especially to the health, safety, mor-
als and general welfare of the citizen, that such legis-
lation can be tolerated. As said by Mr. Justice PECK-
HAM in Lochner v. New York, 198 U. S. 45, the ques-
tion is: "Is this a fair, reasonable and appropriate
exercise of the police power of the State, or is it an
unreasonable, unnecessary and arbitrary interference
with the right of the individual to his personal liberty
or to enter into those contracts in relation to labor
which may seem to him appropriate or necessary for·
the suppport of himself and his family? Of course
the liberty of contract relating to labor includes both
parties to it. The one has as much right to purchase
as the other to sell labor." So that we say again
that if the question we now have was one of first im-
pression, we would hesitate long before saying that this
law did not unreasonably restrict the right to enter
into an otherwise lawful contract. Under this law a
contract with a corporation to receive wages once per
month or once per year would be invalid. Such con-
tract would be void or against public policy as such
public policy is expressed by the statute. Formerly·
this court took a decided stand against legislation of
this character. [State v. Loomis, 115 Mo. 307.] But
we had the question again before us in State ex rel. v.
Vandiver, 222 Mo. 206. In that case we had a statute
under review which infringed upon the right to con-
tract. In a dissenting opinion therein the writer urged

upon the court all of the Missouri cases which we are now referred to by counsel for appellant. We then relied especially upon the Loomis, Julow, and other cases now cited by us, but without avail. The majority of this court (there being four to three) ignored these former precedents upon the question, and upheld the law. If the law in the Vandiver case was valid in this respect, the law in this case should be held valid. This Vandiver case, is one, at least, of the latest cases upon a statute which attacked the right to contract. So if v ʼ are to be guided by the majority opinion in this Vandiver case, then it should be said that we have departed from the stricter and to my mind more rational views of BLACK, J., in the Loomis case, supra. The Vandiver case upon this question controls in a very large measure this case. The matter was fully fought out there. In fact the minority opinion was written for the opinion of the court in that case, but was rejected, and then redrafted with slight changes for the minority opinion. It cannot, therefore, be said that the whole matter was not fully threshed out at that time. Following this our latest precedent, I am now constrained to hold that the law in hand is not such an unreasonable exercise of the police power as to invalidate it. It certainly goes to the verge of that power, as did the law in the Vandiver case. To say the most it certainly does not further extend the police power than does the Vandiver case. Indeed it should be said for the law now before us that there are more features to commend it than there were in the law involved in the Vandiver case. The public policy of this State has been to protect the laborer. We exempt his wages for a given time from execution. We permit him to collect his wages due for a fixed limited period, out of property which would be exempt from other debts. In the White case, supra, we have given him peculiar rights in garnishment proceedings. Other provisions might be mentioned, but these suf-.

fice to show the public policy of the State, and the law in hand might be said to be along the same line of public policy.

In addition from an examination of the cases from other States involving similar laws as to the time of the payment of wages it appears that most of the courts have held such laws valid as a reasonable exercise of the police power of the State. So that in view of the condition of our own cases involving this question, and further in view of the trend of opinion elsewhere upon laws practically identical with the law we have under consideration, I am constrained to concur in the result reached by the principal opinion. *Lamm* and *Ferriss, JJ.*, concur in these views.